James **SINGLETON**, Petitioner,

v.

**UNITED STATES of America,
Respondent.**

Civ. No. 92–1277 (JAF).
Crim. No. 88–014.

United States District Court,
D. Puerto Rico.

April 8, 1992.

James Singleton, pro se.

Carlos A. Pérez–Irizarry, Asst. U.S. Atty., Daniel F. López–Romo, U.S. Atty., San Juan, P.R., for U.S.

## OPINION AND ORDER

FUSTE, District Judge.

This is a *pro se* 28 U.S.C. § 2255 petition filed by James Singleton. Mr. Singleton was convicted by a jury on May 11, 1988 of having violated 18 U.S.C. § 2 and 46 U.S.C.App. § 1903(a), (c) and (f), aiding and abetting in the possession with intent to distribute marijuana. This court sentenced Mr. Singleton to 360 months. Mr. Singleton appealed his conviction, arguing that this court both improperly dismissed his Fed.R.Civ.P. 29 motion and imposed an unfair sentence. The First Circuit affirmed this court's rulings. *U.S. v. Doe*, 921 F.2d 340 (1st Cir.1990).[1]

Petitioner now raises a number of other issues in his federal habeas corpus petition: (1) that the judge committed reversible error in issuing the jury instructions; (2) that the government failed to issue proper *Miranda* warnings; (3) that the government failed to prove the necessary elements of the aiding and abetting count; (4) that the government lacked the jurisdiction to impose United States law on the vessel, the *Marilyn E;* (5) that the government lacked probable cause to board and search the vessel; (6) that the court should have ad-

---

1. The petitioner, James Singleton, was originally indicted as John Doe, a/k/a James Singleton. As a result, the caption in the above case does not reflect the fact that the petitioner was the sole appellant.

vised petitioner of his right to a separate trial; and (7) that petitioner was denied effective assistance of counsel. Several of these issues have already been resolved by this court and the First Circuit.

*Facts*

We draw the facts from the circuit opinion. The testimony at trial established that on January 5, 1988, the United States Coast Guard Cutter *Dauntless* approached a vessel on the high seas off the coast of Cuba. Since the vessel was coming from the direction of Haiti, Ensign Pulver and other officers aboard the *Dauntless* discussed whether a boarding of the vessel was warranted because of possible immigration law violations. After having sighted the vessel, the *Dauntless* attempted to establish radio communication on two channels and in three languages. The *Dauntless* received no reply, and no electronic communication was established. On drawing closer to the vessel, Ensign Pulver saw on the vessel the name *Marilyn E* and some letters, but he could not see a home port designation or flag. Ensign Pulver and the boarding party boarded a smaller Coast Guard vessel, and drew closer to the *Marilyn E*. At a distance of about thirty yards, voice contact was established, and someone on the vessel identified it as being from Jamaica.

Ensign Pulver requested and was given permission to board the *Marilyn E*. He was told by someone on the *Marilyn E* that there were seven people on board. This proved to be correct as all seven were arrested, although only six were indicted. Upon boarding the vessel, Ensign Pulver asked for the certificate of documentation. In response to his request, he was given a bill of sale, which was improper documentation. A "sweep team" searched the vessel, and Ensign Pulver asked what was in the hold. The master of the vessel replied that there was ice in the hold. Ensign Pulver then requested and was given permission by the master to open the hold.

Upon opening the hold, Ensign Pulver discovered bales up to the top of the hold, and stated that he could tell by the smell that the bales contained marijuana. That the bales contained marijuana was later confirmed by a field test. At trial, other members of the Coast Guard testified that there were 102 bales of marijuana, weighing approximately forty pounds each. Ensign Pulver requested authority from the Commander of the *Dauntless* to arrest the persons on board the *Marilyn E*. Since the Coast Guard required the permission of the country of origin to arrest the persons on board the *Marilyn E*, they were asked if there were flags on board to show a registry. The master first replied that there were no flags on board and then corrected himself saying that he thought there was one forward. Having heard Ensign Pulver's question, Mr. Singleton had apparently located two flags in the forward portion of the boat. Ensign Pulver took the two flags, one yellow and the other a United States flag. The yellow flag was later identified as being a flag from Quebec.

Since the vessel was originally identified by someone on board as being from Jamaica, the Coast Guard requested that Jamaica grant permission for the arrests. Ensign Pulver wanted to cover all bases, since it was unclear at the time whether the vessel was a United States vessel, as the bill of sale and United States flag indicated, or a Jamaican vessel, as someone had claimed, or a stateless vessel. While waiting for a reply, the persons on board the vessel slept. After several hours, the Coast Guard received permission from the Jamaican government and the commandant of the Coast Guard to make the arrests. The defendants were thereafter transferred to the *Dauntless*. The *Marilyn E* was attached to the *Dauntless* by a towline, and both vessels proceeded toward Puerto Rico.

The testimony also revealed that although the passengers on the *Marilyn E* claimed that it was a fishing vessel, it was in disrepair and ill equipped for fishing or any other kind of long-term travel. No fishing gear, refrigeration, ice, or back-up equipment was found on board. The vessel leaked and, indeed, during the trip to Puerto Rico, the *Marilyn E* sank. Mr. Singleton did not testify on his own behalf; how-

ever, a codefendant testified that Singleton had asked him for a ride to the Bahamas because Mr. Singleton's girlfriend had destroyed his papers. According to Mr. Gordon, the owner of the boat was the one who gave permission for Mr. Singleton to be on the boat. The First Circuit found that although the evidence against Mr. Singleton was largely circumstantial, it was nevertheless reasonable to find that he knew of the purpose of the trip and aided and abetted in the possession of the marijuana.

### Petitioner's Claims

Relief which may not be granted on direct appeal because additional facts need to be established may be pursued via 28 U.S.C. § 2255. *U.S. v. Parra–Ibañez*, 936 F.2d 588, 593 (1st Cir.1991). However, this does not mandate that the court hold an evidentiary hearing for every section 2255 petition. The rules promulgated by the Supreme Court pursuant to 28 U.S.C. § 2072 and 18 U.S.C. §§ 3771–3772 to govern the procedure for handling section 2255 petitions allow that "if it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief in the district court, the judge shall make an order for its summary dismissal and cause the movant to be notified." Rule 4(b). The judge may make this determination without an evidentiary hearing if "petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or if the allegations cannot be accepted as true because 'they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.' " *Dziurgot v. Luther*, 897 F.2d 1222, 1225 (1st Cir.1990); *see also U.S. v. Michaud*, 925 F.2d 37, 39 (1st Cir.1991).

This court addressed several of the claims petitioner is raising in an earlier opinion which decided the section 2255 peti-

tion of Willie Gordon, one of Mr. Singleton's codefendants.[2] Mr. Singleton's petition raises several questions that concern nationality of the *Marilyn E* and the jurisdiction of the Coast Guard over her. These are questions which are common to both defendants and were discussed at length in the earlier order. We continue to find the reasoning of that opinion persuasive and adopt the rulings of the earlier decision on those issues raised by petitioner.

Petitioner raises three questions addressed by the earlier decision: whether the Coast Guard had the jurisdiction to impose U.S. law on a vessel on the high seas whose nationality was unclear; whether the judge improperly took the issue of the vessel's nationality away from the jury; and whether the Coast Guard had probable cause to board and search the vessel. In that decision, this court found that the Coast Guard had jurisdiction over the vessel under Art. 1 § 8 of the Constitution. We found that Congress clearly intended the statute under which petitioner was convicted, 46 U.S.C.App. § 1903,[3] to extend to all vessels on the high seas to the extent that there was no conflict with international law. In this respect, the First Circuit has held that international law is satisfied where the foreign flag country consents, as Jamaica did, to the application of United States law on the high seas. *United States v. Robinson*, 843 F.2d 1 (1st Cir.), *cert. denied*, 488 U.S. 834, 109 S.Ct. 93, 102 L.Ed.2d 69 (1988). Therefore, regardless of the vessel's nationality or lack thereof, the jurisdiction of the Coast Guard was proper. The earlier decision admitted that this court's failure to submit the question of the vessel's nationality to the jury was an error; however, we found it constituted a harmless error. We concluded that the jury would have had to find that the *Marilyn E* was a United States vessel for the purposes of 46 U.S.C.App. § 1903 as a mat-

**2.** This order has been appended to this opinion as Appendix I. *Willie Gordon v. United States of America*, Civil No. 89–0400 (D.P.R. March 12, 1991). The order was never appealed.

**3.** 46 U.S.C.App. § 1903:

It is unlawful for any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States, ... to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

ter of law. And finally, according to First Circuit law, the Coast Guard may stop vessels on the high seas if it has a reasonable suspicion that the ship is subject to the jurisdiction or to the operation of the law of the United States, *i.e.*, is a stateless vessel. *United States v. Potes*, 880 F.2d 1475, 1478 (1st Cir.1989). In this case, we found that the suspicion that the vessel was stateless was reasonable given that the *Marilyn E* answered no attempted radio contact, had no home port designation, and flew no flag. We also found that since the master consented to the search of the hold, the search was constitutional. We adopt this reasoning in answer to the first, fourth and fifth grounds for setting aside the verdict alleged in petitioner's section 2255 petition.

■ The third ground, whether the aiding and abetting charge was properly included in the jury instructions and the conviction supported by sufficient evidence, was addressed on appeal. *U.S. v. Doe*, 921 F.2d at 346. The First Circuit found that the jury instructions were proper and the conviction was supported by sufficient evidence. When an issue has been decided on direct appeal, it cannot later be revived through a section 2255 petition. *U.S. v. Butt*, 731 F.2d 75, 76 n. 1 (1st Cir.1984). This leaves the second, sixth, and seventh grounds for this court to consider at the point.

### Miranda Violation

■ Petitioner has waived his right to raise a fifth amendment claim. Pursuant to Fed.R.Crim.P. 12(b)(3), motions to suppress evidence "must be raised prior to trial," and failure to do so "shall constitute waiver thereof," Fed.R.Crim.P. 12(f), unless the court grants relief on a showing of good cause. *U.S. v. Leal*, 831 F.2d 7 (1st Cir.1987). Although at one point petitioner made a motion reserving the right to make a motion to suppress once discovery was terminated, no such motion was ever filed. An intention to make a motion does not constitute a motion. Petitioner also did not raise the issue on appeal. The First Circuit has recognized that a defendant cannot, by means of a section 2255 motion, revive rights lost by a voluntary failure to appeal. *López–Torres v. U.S.*, 876 F.2d 4, 5 (1st Cir.), *cert. denied*, 493 U.S. 979, 110 S.Ct. 508, 107 L.Ed.2d 510 (1989); *Martin v. United States*, 462 F.2d 60, 62–63 (5th Cir.), *cert. denied*, 409 U.S. 1043, 93 S.Ct. 539, 34 L.Ed.2d 494 (1972). The defendant has waived his right to contest any possible *Miranda* violation.

### Joint Trial

■ The prosecution is entitled to charge and join parties in an indictment on the basis of what it reasonably anticipates to prove against them. *U.S. v. Boylan*, 898 F.2d 230 (1st Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990). Here, joinder was proper under the requirements laid out by Fed.R.Crim.P. 8(b). Joinder is proper where facts and legal issues overlap enough that the practical benefit of a consolidated trial outweighs each defendant's interest in having guilt considered individually. *U.S. v. Arruda*, 715 F.2d 671 (1st Cir.1983); *U.S. v. Doherty*, 867 F.2d 47 (1st Cir.), *cert. denied* in *Deliere v. United States*, 492 U.S. 918, 109 S.Ct. 3243, 106 L.Ed.2d 590 (1989). The severance of the defendants for trial, when they have been charged in the same indictment, is left to the discretion of the trial court upon motion of the defendant. Fed.R.Crim.P. 14. This is reviewed on the basis of abuse of discretion. *U.S. v. Porter*, 764 F.2d 1, 12 (1st Cir.1985), *cert. denied*, 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987). Petitioner claims that this court was required to inform him of his right to a separate trial, at which point he needed to waive that right. Petitioner is basing his argument upon *U.S. v. Elkins*, 774 F.2d 530 (1st Cir.1985). That case dealt with multiple representation, not separate trials, a situation where the judge does have an obligation to advise a defendant of his right to his own attorney. But there is no independent duty on the part of a judge to inform a defendant of his right to move for severance; that duty falls to the defendant's attorney. Where there was no motion for severance, as is the case here, the judge has no reason to consider

severing the trials. Petitioner claims that he made a motion for severance, but there is no record of any such motion reflected in the record. We did consider the severance motion of one of Mr. Singleton's codefendants and it was denied.

### Ineffective Assistance of Counsel

A claim of ineffective assistance of counsel must allege the specific facts upon which a petitioner is grounding his argument that his representation was deficient. *Street v. Fair*, 918 F.2d 269, 271 (1st Cir. 1990). Here, petitioner argues that the failure of his attorney to argue that the Coast Guard had no jurisdiction over the vessel at the time of boarding, which might have resulted in the dismissal of charges against the petitioner, constituted ineffective assistance of counsel. To establish that he was not effectively represented, the petitioner must show that his attorney's "deficient performance prejudiced his defense to the point that there is a reasonable probability that the deficiency was outcome determinative." *U.S. v. Michaud*, 925 F.2d 37, 41 (1st Cir.1991); *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). It is extremely difficult to establish that the attorney's performance was deficient, since "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065. While the issue of jurisdiction over the vessel is clearly important, we cannot find that the issue was outcome determinative. The law in this area is very complicated and it is conceivable that petitioner's attorney decided to omit the argument for strategic reasons. But more importantly, this court found that the Coast Guard had jurisdiction over the vessel, so the issue was not outcome determinative. The fact that none of the six attorneys representing the six codefendants, three of whom were acquitted, made this argument undermines petitioner's argument that failure to pursue this particular avenue was outcome determinative. Even if it could be shown that all six attorneys were wrong in failing to make a jurisdiction argument, "[a]n error by coun-

sel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691, 104 S.Ct. at 2066. The behavior of petitioner's attorney was not unreasonable and did not result in an outcome prejudicial to petitioner. We deny petitioner's claim of ineffective assistance of counsel.

### Conclusion

We find that all seven grounds for petitioner's section 2255 petition fail. The petition is denied in its entirety.

IT IS SO ORDERED.

### APPENDIX I

United States District Court

District of Puerto Rico

Civil No. 89–0400 (JAF)

(Criminal No. 88–014)

Willie Gordon, Petitioner,

v.

United States of America, Respondent.

### ORDER

This matter comes to us by way of a *pro se* 28 U.S.C. section 2255 petition filed by petitioner Willie Gordon. Mr. Gordon was convicted by a jury on May 10, 1988, of violating 18 U.S.C. § 2 and 46 U.S.C.App. § 1903 (possession with intent to distribute marijuana on the high seas). This court sentenced Mr. Gordon to thirteen years followed by five years of supervised release, which was within the guideline imprisonment range. Mr. Gordon raises several issues of law regarding his conviction. We indulge petitioner, as a *pro se* litigant, construing his pleadings generously. *United States v. Hubert Michaud*, 925 F.2d 37 (1st Cir.1991).

1) Petitioner attacks the validity of the statute under which he was convicted. He claims that Congress lacks the power to create the subject matter jurisdiction asserted, since the statute purports to proscribe activity which takes place outside the United States territorial limit, by non-

United States citizens, with no proof that the targeted parties intend to distribute drugs within the United States, nor even that the ship on which they were sailing was heading towards or planning to visit any United States territory. Since we find that the congressional exercise of the power is justified, we reject petitioner's argument on that point.

2) In challenging the jurisdiction over the vessel on which petitioner was arrested, petitioner raises, albeit indirectly, an examination of what we now consider to be an improper jury instruction. The issue of how the vessel was "subject to United States jurisdiction" was taken away from the jury. We find the instruction to be improper, but not requiring a new trial.

3) Petitioner raises a claim that the stop, boarding, and search by the Coast Guard of the ship on which he was travelling were illegal, and that the introduction at his trial of the marijuana obtained during that procedure violated his constitutional rights. We reject this proposition on a number of grounds.

4) Petitioner raises the claim that he was denied effective assistance of counsel when his court-appointed lawyer, after filing a Notice of Appeal, failed to perfect.

5) Lastly, petitioner hints that he was also denied effective assistance when his attorney failed to file a Rule 35 motion to reduce his sentence. We find no prejudice in either inaction by his attorney. We take up these matters in order.

## I.

### Facts

A recent decision by the First Circuit in the appeal of one of petitioner's codefendants, James Singleton, sets out a useful summary of the facts as they came out at the trial. *United States of America v. John Doe, a/k/a James Singleton*, 921 F.2d 340, 342–43 (1st Cir.1990). We draw from and supplement that summary.

The testimony at trial revealed that on January 5, 1988, the United States Coast Guard Cutter *Dauntless* approached a vessel on the high seas off the coast of Cuba. Since the vessel was coming from the direction of Haiti, Ensign Pulver and other officers aboard the *Dauntless* discussed whether a boarding of the vessel was warranted because of possible immigration law violations. After having sighted the vessel, the *Dauntless* attempted to establish radio communication on two channels and in three languages. The *Dauntless* received no reply, and no electronic communication was established. On drawing closer to the vessel, Ensign Pulver saw on the vessel the name *Marilyn E* and some letters, but he could not see a home port designation or flag.

Ensign Pulver and the boarding party boarded a smaller Coast Guard vessel, and drew closer to the *Marilyn E.* At a distance of about thirty yards, voice contact was established, and someone on the vessel identified it as being from Jamaica.

Ensign Pulver requested and was given permission to board the *Marilyn E.* He was told by someone on the *Marilyn E* that there were seven people on board. This proved to be correct as all seven were arrested, although only six were indicted.

Upon boarding the vessel, Ensign Pulver asked for the certificate of documentation. In response to his request, he was given a bill of sale, which was an improper documentation. The "sweep team" searched the vessel, and Ensign Pulver asked what was in the hold. Petitioner, the master of the vessel, replied that there was ice in the hold. Ensign Pulver then requested and was given permission by petitioner to open the hold.

Upon opening the hold, Ensign Pulver discovered bales up to the top of the hold, and stated that he could tell by the smell that the bales contained marijuana. That the bales contained marijuana was later confirmed by a field test. At trial, other members of the Coast Guard testified that there were 102 bales of marijuana, weighing approximately forty pounds each. Ensign Pulver requested authority from the Commander of the *Dauntless* to arrest the persons on board the *Marilyn E.* Since the Coast Guard required the permission of

the country of origin to arrest the persons on board the *Marilyn E*, they were asked if there were flags on board to show a registry. Petitioner replied that there were no flags. James Singleton stated that he thought that there were flags in the forward section. Two flags were found in the forward section, one yellow and the other a United States flag.

Since the vessel was originally identified by someone on board as being from Jamaica, the Coast Guard requested that Jamaica grant permission for the arrests. Ensign Pulver wanted to cover all bases, since it was unclear at the time whether the vessel was a United States vessel, as the bill of sale and United States flag indicated, or a Jamaican vessel, as someone had claimed, or a stateless vessel. While waiting for a reply, the persons on board the vessel slept. After several hours, the Coast Guard received permission from the Jamaican government and the commandant of the Coast Guard to make the arrests. The defendants were thereafter transferred to the *Dauntless*. The *Marilyn E* was attached to the *Dauntless* by a towline, and both vessels proceeded toward Puerto Rico.

The testimony also revealed that although the passengers on the *Marilyn E* claimed that it was a fishing ship, it was in disrepair and ill equipped for fishing, or any other kind of long-term travel. No fishing gear, refrigeration, ice, or back-up equipment was found on board. The vessel leaked and, indeed, during the trip to Puerto Rico, the *Marilyn E* sank.

The documents found on board were a Certificate of Documentation and the Bill of Sale referred to above. The Certificate of Documentation is on an official Coast Guard form, dated April 5, 1983, and carrying an expiration date of April 1986. (Exh. 5). The document states that Clyde Randolph Eubanks was the owner. The Bill of Sale shows that the *Marilyn E* was sold by Eubanks to a Hubert Henderson on February 3, 1986. There was no evidence produced at trial with respect to the current owner of the vessel, nor his or her nationality, apart from petitioner's own theory, expounded on the stand, that the "Mr. Walker" who hired petitioner to run the boat was probably its owner. Tr. at 15 (May 11, 1988).

## II.

### *Subject Matter Jurisdiction: Validity of Jurisdiction Over a Vessel on the High Seas*

The conviction of petitioner took place pursuant to 46 U.S.C.App. § 1903. All sides concede that the stop and arrest took place on the high seas, that is, outside the 12 mile "Customs" waters of the United States and not within the territorial waters of any foreign country. The relevant part of the applicable statute provides that: "It is unlawful for any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States, ... to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance." The statute at issue here makes no requirement that the illegal activity have any connection with the territorial United States besides the requirement that the vessel be subject to United States jurisdiction (a requirement we will discuss at length later in the opinion). The government need not prove that the parties charged had any intention of importing the controlled substances into the United States. *Compare, United States v. Wright–Barker*, 784 F.2d 161 (3rd Cir.1986) (court explores power of Congress to assert criminal jurisdiction on high seas for intent to import controlled substances into United States).

Petitioner challenges the power of Congress to exert the jurisdiction of the United States over non-United States citizens, in international waters, not proven to have any intent to commit an illegal act in the territorial United States nor which would result in the importation of any controlled substances into the United States. Petitioner also claims such an application is a violation of international law.

Congress' Article 1, Section 8 power to extend jurisdiction here lies in three possible sources: its power to "provide for the

common Defense and general Welfare," the Commerce Clause, or its power "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations." *United States v. Smith*, 680 F.2d 255 (1st Cir. 1982), *cert. denied*, 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983) (roots congressional power to enact 21 U.S.C. § 955(a), precursor statute, in "Piracies and Felonies" clause). The statute itself contains the following congressional finding:

> The Congress finds and declares that trafficking in controlled substances aboard vessels is a serious international problem and is universally condemned. Moreover, such trafficking presents a specific threat to the security and societal well-being of the United States.

46 U.S.C.App. § 1902.

The precursor to the current statute, 21 U.S.C. § 955a(a), which made it unlawful for "any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States on the high seas, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance" has been held to be a constitutional exercise of congressional power. *United States v. Smith*, 680 F.2d at 258; *United States v. Stuart–Caballero*, 686 F.2d 890 (11th Cir.1982), *cert. denied*, 459 U.S. 1209, 103 S.Ct. 1202, 75 L.Ed.2d 444 (1983); *United States v. Mena*, 863 F.2d 1522 (11th Cir.1989), *cert. denied, Brack–Brack v. United States*, 493 U.S. 834, 110 S.Ct. 109, 107 L.Ed.2d 72 (1989) (Court dismisses facial challenge to 46 U.S.C.App. § 1901 *et seq.* and refers to history of judicial acceptance of 21 U.S.C. § 955a(a)). Congress has specifically explained in the statute at issue here that its desire to curb trafficking of the high seas is driven by the effect of such trafficking on the United States.[1] *But see, United States v. Alvarez–Mena*, 765 F.2d 1259, 1267, n. 11 (5th Cir.1985) (suggestion that Congress did not intend section 955a(a) to reach a "situation where the interests of the United States are not even arguably potentially implicated").

It is a second question as to whether that power, otherwise available, is curtailed by international law. *United States v. Smith*, 680 F.2d at 257. If the ship is an American vessel, there can be no question that, as a matter of international law, the United States can regulate activity on United States' vessels, wherever they may be. *United States v. Robinson*, 843 F.2d 1 (1st Cir.), *cert. denied*, 488 U.S. 834, 109 S.Ct. 93, 102 L.Ed.2d 69 (1988). Where the ship is a foreign vessel, the question is slightly more complex.

Plaintiff's first difficulty is a question of standing. *United States v. Greyshock*, 719 F.Supp. 927 (D.Hawaii 1989). The statute specifically limits standing to complain about violations of international law in connection with the enforcement of this section to the foreign states who might believe international law to be violated by an action under this section.

> A claim of failure to comply with international law in the enforcement of this chapter may be invoked solely by a foreign nation, and a failure to comply with international law shall not divest a court of jurisdiction or otherwise constitute a defense to any proceeding under this chapter.

46 U.S.C.App. § 1903(d).

We do not think, however, that the quoted section precludes the interposition of international law by a defendant for all purposes. While international law might provide no *defense* to the individual defendant, it might well provide a basis for statutory interpretation which might define the statute in such a way as to render the defendant's acts outside the purview of the

---

1. At least Justice Rehnquist believes that bare Congressional assertions, unsupported in reality, do not create Article 1 section 8 power where it would not otherwise exist. As Justice Rehnquist stated in a non-criminal regulatory context, "simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 311, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981).

proscribed activity. For instance, the legislative history for 21 U.S.C. section 955a shows that Congress intended to specifically limit prosecution under the statute which would not be violative of international law. S.Rep. No. 855, 96th Cong., 2d Sess. 2 (1980), U.S.Code Cong. & Admin.News 1980, p. 2785. *United States v. Robinson,* 843 F.2d 1 (1st Cir.1988); *Murray v. The Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804) (Marshall, Ch.J.) ("an act of congress ought never to be construed to violate the law of nations, if any other possible construction remains"). A defendant might fruitfully argue that application of the statute in his or her case, if violative of international law, would not be sanctioned by the enacting Congress. Such an argument would not trespass the standing bar set up in the statute.

Unfortunately for defendant here, there is no basis for a claim that the jurisdiction claimed by the statute is violative of international law. As the First Circuit held in *Robinson,* international law is satisfied where the foreign flag country consents to the application of United States law on the high seas. "It is clear, under international law's 'territorial principal,' that a 'state has jurisdiction to prescribe and enforce a rule of law in the territory of another state to the extent provided by international agreement with the other state.'" *Robinson,* 843 F.2d at 4, *quoting* from the *Restatement (Second) of Foreign Relations Law of the United States.* The court in *Robinson* reasoned that since a country has jurisdiction over its own ships on the high seas, it can cede such jurisdiction to another country. In this case, Jamaica ceded whatever power it had over the *Marilyn E* to the United States, paving the way for the assertion of United States law in a manner consistent with international law.

Therefore, there is nothing offensive to the Constitution nor inconsistent with international law for the United States to assert jurisdiction over its own vessel in international waters to prohibit the activity prescribed by this statute, nor for the United States to do the same over a vessel the flag country of which has ceded jurisdiction to the United States. Petitioner's challenges to the validity of the statute itself are unavailing.

### III.

#### *Jury Instruction*

As we have just set out, exercise of jurisdiction over either a United States vessel or one "subject to the jurisdiction" of the United States is permissible. "Subject to the jurisdiction" includes a foreign vessel whose country of registration cedes jurisdiction to the United States. There was an error in our charge to the jury on that issue. The court charged the jury as follows:

> Well, in this particular case, one of the elements that you will have to decide is whether this was a vessel of the United States and there is no real controversy in my mind about that. The parties, the evidence is there. There is [sic] exhibits that tell you that this vessel was registered, documented in the United States and it gives you the whole particulars, length, width, owners, the whole bit, ....

> The statute says that basically this, it is unlawful for any person on board a vessel of the United States or on board a vessel subject to the jurisdiction of the United States and in this particular case, I already pointed to you out the fact the there is no real controversy about that fact....

> That is what you have to decide, possess with the intent to manufacture and distribute a controlled substance and then sub-section C is the one that defines a vessel subject to the jurisdiction of the United States and I already told you that the *Marilyn E,* with the papers that we have on hand, is a vessel subject to the jurisdiction of the United States....

> So, therefore, the real issue here is whether they possessed with the intent

to manufacture or distribute a controlled substance on board the *Marilyn E.*

Tr. at 147 (May 11, 1988).

It was error for the court not to submit this issue as a factual matter to be decided by the jury. In *United States v. Potes*, 880 F.2d 1475, 1478, n. 1 (1st Cir.1989), the First Circuit wrote:

> [T]he district court gave the case to the jury without instructing it that, to convict, it must find that the vessel was "subject to the jurisdiction of the United States." This essential element of the offense required resolution of the factual issue of whether the vessel was stateless. Because this jurisdiction requirement was an element of the offense, and because it depended upon factual as well as legal determination, it was for the jury to decide whether it had been satisfied. *See United States v. Canales*, 744 F.2d 413, 434 (5th Cir.1984) ("the trial court may under *no* circumstances withdraw any element of an offense from the jury's consideration in a criminal case").... *United States v. Ayarza–Garcia*, 819 F.2d 1043, 1048–1049 (11th Cir.) (the jurisdictional element is a material element of the crime under 21 U.S.C. § 955a(a) and, upon denial of defendants' Rule 29 motion, is a question for the jury), *cert. denied* [484 U.S. 969, 108 S.Ct. 465, 98 L.Ed.2d 404 (1987)], ... The defendants did not object to the jury instructions. But failure to instruct the jury on an element of the crime may be so clear an error as to require a new trial despite the lack of a timely objection.... Thus, even were we to accept the district court's view that the evidence was sufficient to support appellants' convictions, we might well be required to remand the case for a new trial. (Some citations omitted, emphasis in original).

Although we concede error in having taken the matter away from the jury, we find that the evidence on this point *was* sufficient to support the convictions. None of the six defense counsel in this case objected to the charge as given. None of the six defense counsel argued the issue of the vessel's nationality to the jury, even during the closing. It was, in all but the technical sense of the phrase, a "non-issue." Under these circumstances, we rely on the implication in *Potes* that taking the matter from the jury is not necessarily clear error requiring a new trial.

A "vessel of the United States" includes a "vessel documented under chapter 121 of Title 46." A "Certificate of Documentation" which appears to refer to the subject vessel was submitted into evidence (Exh. 5). The Certificate is on the Coast Guard approved form, and lists the particulars about the ship. The document identifies a Clyde Randolph Eubanks as the owner as of April 5, 1983, the date of the signatures on the document. The document has a stamp on it which states: "EXPIRES LAST DAY OF APR 1986" along with a documentation number.

Also submitted into evidence is a "BILL OF SALE", also on a Coast Guard form, referring to the *Marilyn E,* and the same official number as the Certificate of Documentation (Ex 2). The Bill of Sale identifies Eubanks as the seller of the vessel, and a Hubert Henderson as the purchaser. The document is dated February 3, 1986, and is notarized in North Carolina. There is no indication of the nationality of Mr. Henderson. Our review of the transcript and other documents reveals no reference to either person apart from the references in the two documents just mentioned. At one point in the testimony, the petitioner in this case testified "I don't know who is the owner [of the *Marilyn E* ] but Mr. Walker himself gives me the job. It looks like it is his boat. It must be his boat." Tr. at 15 (May 11, 1988).

Documentation of United States vessels is dealt with in 46 U.S.C. § 12101 *et seq.* (the chapter 121 referred to in 46 App. § 1903). It would appear that although the *Marilyn E* once possessed a valid certificate of documentation, by the date of the subject offense, January 5, 1988, that certificate of documentation was invalid for multiple reasons. The document itself states that it would expire in April of 1986. Section 12111 states that a certificate be-

comes invalid if the vessel for which it is issued "no longer meets the requirement of this chapter and regulation prescribed under this chapter applicable to that certificate of documentation." The regulations state that a Certificate of Documentation is invalid after "[t]he ownership of the vessel changes in whole or in part." 46 C.F.R. § 67.23. Therefore, if for no other reason, the certificate of documentation submitted in evidence was invalid after the transfer of the ship to a new owner in 1986. We have no proof that a new certificate was ever issued. The invalidity of the certificate, however, is not dispositive of the issue of whether the vessel is still considered "documented" for purposes of chapter 121, and, therefore, was still a United States vessel under § 1903. The statute provides in relevant part of 46 U.S.C. § 12111(c)(1) that:

> [U]ntil the certificate of documentation is *surrendered* with the approval of the Secretary, a documented vessel is deemed to continue to be documented under this chapter for purposes of—
>
> . . . .
>
> (B) sections 9 and 37(b) of the Shipping Act, 1916 (46 App.U.S.C. 808, 835(b));
>
> . . . .
>
> (D) any other law of the United States identified by the Secretary by regulation

as a law to which the Secretary applies this subsection. (Emphasis added)

The Maritime Drug Law Enforcement Act (46 App.U.S.C. § 1903, the statute at issue here), is not specifically identified by the regulations as one of the laws to which the "carry-over" documentation principle would apply. However, under 46 App. U.S.C. § 808, it states that:

> [A] person may not, without the approval of the Secretary of Transportation—
>
> . . . .
>
> (2) place a documented vessel, or a vessel the last documentation of which was under the laws of the United States, under foreign registry or operate that vessel under the authority of a foreign country. . . .

The Code of Federal Regulations, 46 C.F.R. § 221.3(c), which was enacted pursuant to the powers given, *inter alia*, in 46 App.U.S.C. § 808, states that "[a] vessel shall be deemed to be documented until such time as surrender of the Certificate of Documentation . . . has been officially accepted by the United States Coast Guard." [2] Therefore, even if the *Marilyn E* was transferred to Jamaican registry, absent proper approval and surrender of its former United States documentation, it would still be a documented United States vessel for purposes of 46 App. § 1903(b)(1).[3] The same result is reached

---

**2.** It might be possible to argue that it would only be the act of transferring to a foreign registry or to foreign control illegally which would trigger the "deemed to continue" language of 46 U.S.C. § 12111(c)(1)(B), or the transfer provisions of 46 App.U.S.C. § 1903(b)(3). This would lead to the conclusion that a vessel the Certificate of Documentation of which becomes invalid merely by, for instance, transfer to another United States citizen without re-registration (46 C.F.R. § 67.23–1(a)(1)), would not be a vessel whose documentation deemed to continue. Under this line of reasoning, it might be argued that the *Marilyn E* lost the validity of its documentation under 46 U.S.C. § 12111(a) (for failing to comply with the regulation requiring re-registration following a change of owners), but that if it was never put under Jamaican control, there could be no deeming of continued documentation, pursuant to 46 U.S.C. § 12111(c)(1). Therefore, the *Marilyn E* was not a documented United States vessel as of January 1988. Since we have no proof as to the nationality of its owner at that time, it would seem not to fall within the definition of a

United States vessel at all. This seems not to be a fruitful avenue for the petitioner, however, since it ultimately would only render the vessel one without nationality. A vessel without nationality is also a "vessel subject to the jurisdiction of the United States" under 46 App.U.S.C. § 1903(c).

**3.** It is not even clear that the vessel was in fact registered in Jamaica. The Jamaican government's issuance of a statement of "no objection" to the enforcement of United States law over the *Marilyn E* is not evidence that the *Marilyn E* was registered as a Jamaican vessel. The State Department "DECLARATION" (Exh. 1) is ambiguous on the issue of whether the vessel had a Jamaican registry. It states that the "Government of Jamaica consented to the enforcement of United States law by the United States against the individuals found aboard the F/V Marilyn E" through "Mr. Erol Anderson, the Minister of National Defense, who represented the Government of Jamaica with authority to verify the registration of vessels granted the nationality of

under 46 App.U.S.C. § 1903(b)(3), which states that:

(3) a vessel that was once documented under the laws of the United States and, in violation of the laws of the United States, was either sold to a person not a citizen of the United States or placed under foreign registry or a foreign flag, whether or not the vessel has been granted the nationality of a foreign nation.

Surrender, then, is a term of art describing a formal process in which the documentation of a vessel is offered to and accepted by the Secretary of Transportation. The entire procedure is governed by regulation. 46 U.S.C. §§ 67.25–1 *et seq.* Invalidity of the certificate merely renders the certificate subject to surrender. 46 C.F.R. § 67.-23. There was no evidence presented that anyone ever effectively surrendered the documentation of the *Marilyn E.*

Therefore, with no proof that the certificate of documentation from 1983 was ever surrendered, and no proof that permission to transfer the vessel to a Jamaican registry was ever obtained, we can only conclude that the *Marilyn E* was still a United States vessel for purposes of 46 App. U.S.C. § 1903 as of January, 1988.[4] While the certificate of documentation itself is not conclusive evidence of nationality, here there is nothing to contradict continuing United States documentation.[5] Although we admit error in taking the issue from the jury, the "factual" issue which would have gone to the jury would have been severely limited by the legal conclusions which must be drawn from the documents submitted. Essentially, the jury would have been instructed that if they found as a factual matter that in 1983 the *Marilyn E* was a documented vessel and that subsequently no surrender of its documentation had tak-

en place and no approval to transfer the vessel to a foreign state had been granted (facts they could have found by a lack of proof to the contrary), they would have had to find that the ship was a United States vessel as a matter of law. We believe that the erroneous instruction was harmless error.

## IV.

### *Seizure and Search*

Petitioner argues that the stop (seizure), boarding, and search of the ship are illegal and the introduction at trial of evidence obtained from such illegal acts should not have been introduced at his trial.

Defendant argues that the Coast Guard did not have authority to conduct the seizure of the ship and subsequent search. Although plaintiff does not specify why a lack of authority on the part of the Coast Guard would in any way affect his conviction, we can assume that the claim is that the search, if conducted without a warrant and beyond the scope of proper authority, would constitute an unreasonable search and seizure under the fourth amendment, requiring suppression of the evidence illegally obtained.

In *United States v. Victoria–Peguero*, 920 F.2d 77 (1st Cir.1990), the court faced a challenge to a border search of a ship entering United States waters. The searchers were members of the Puerto Rico police who had been "deputized" as U.S. customs officials pursuant to 19 U.S.C. § 1401. The defendants complained that the search violated the fourth amendment since the officers had not been and could not be properly authorized under the statute. Though the court ultimately found the authorization valid, and upheld the search, the court's analysis makes clear that whether the search was conducted validly as per statute

---

Jamaica and to consent to the enforcement of law against *vessels of its nationality* by other nations" (emphasis added). While petitioner claimed that "there was a registration from Jamaica" (Tr. 25, May 11, 1988) on the vessel, no such registration was produced.

4. The government here failed to produce any proof that a valid surrender did not exist, and

the defense failed to produce any evidence that it did exist.

5. 46 U.S.C. § 12104 reads: "Effect of documentation, A certificate of documentation is—(1) conclusive evidence of nationality for international purposes, but not in a proceeding conducted under the laws of the United States."

might implicate the validity of the search under the fourth amendment.[6]

Since it is ultimately the fourth amendment and its judicially-created remedy of suppression to which defendant turns, two threshold questions immediately present themselves. The first is whether the stop and search were with consent. The boarding party was given permission to board the vessel, and subsequently was given permission to open the hold. The second is whether petitioner can show a property interest in the things seized or a privacy interest in the place searched in order to assert standing to challenge the introduction of this evidence. *United States v. Cruz Jiménez*, 894 F.2d 1 (1st Cir.1990).

It is likely that the stop and boarding procedure is justifiable on the theory of consent. However, we can justify this procedure even absent consent, and thereby avoid questions about the authority of the unidentified person who have the permission to board.

## V.

*Stop, Boarding, and Initial "Sweep"*

The relevant section of the Regular Coast Guard Functions and Powers Law, 14 U.S.C. § 89, states that:

The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance.

The First Circuit has repeatedly held that an American flag ship may be stopped on the high seas without any particularized suspicion of wrongdoing for purposes of conducting an administrative safety and document inspection. *United States v. Elkins*, 774 F.2d 530 (1st Cir.1985). In order to stop a vessel which is not an American flag ship, the Coast Guard must have a reasonable suspicion that the ship is "subject to the jurisdiction, or the operation of law, of the United States." *United States v. Potes*, 880 F.2d 1475, 1478 (1st Cir.1989); *United States v. Williams*, 617 F.2d 1063, 1076 (5th Cir.1980) (en banc); *United States v. Alvarez–Mena*, 765 F.2d 1259, 1268 (5th Cir.1985). A vessel on the high seas may be subject to the jurisdiction of the United States if it is a stateless vessel. The 1958 Convention of the High Seas provides that "[a] ship which sails under the flags of two or more States, using them according to convenience, may not claim any of the nationalities in question with respect to any other State, and may be assimilated to a vessel without nationality." Convention on the High Seas, art. 6(2), *opened for signature* April 29, 1958, 13 U.S.T. 2312, T.I.A.S. No. 5200, as cited in *United States v. Passos–Paternina*, 918 F.2d 979, 982 (1st Cir.1990). For purposes of justifying the initial boarding, the Coast Guard need only have a reasonable belief that the vessel is interchangeably claiming multiple nationalities (and therefore is a "stateless" vessel). The vessel need not be observed making a multiple claim by the Coast Guard in order for the suspicion to be reasonable to allow boarding. For instance, in *Passos*, the Coast Guard sighted a flagless vessel bearing no homeport designation. Initial attempts to gain radio contact were unsuccessful. After the Coast Guard ship came into sight of the subject vessel, the vessel changed course, criss-crossed the bow of the Coast Guard ship, and refused to consent to boarding. Finally, the master stated that the vessel was Colombian. The Coast Guard person-

---

**6.** The court did not reach the issue of whether the search and seizure there *would* have to be suppressed if the searchers were not validly authorized. We rely on *Victoria–Peguero* for

the limited holding that the statutory authority of a search may be a factor in determining the fourth amendment issues surrounding such a search.

**506**

nel forcibly boarded the vessel after firing warning shots across its bow.

In the case before us, the Coast Guard sought to establish radio communication with the *Marilyn E* on two channels and in three languages. The vessel failed to reply. The Coast Guard officer could see no homeport designation, and the ship flew no flag. On the basis of those facts Coast Guard officers boarded a smaller Coast Guard vessel and headed for the *Marilyn E*. When they were almost upon her (thirty yards) "someone" identified the ship as being Jamaican.

It was certainly reasonable for the Coast Guard officers in the case at hand, considering the lack of a flag, the non-visibility of a homeport designation, and the evasive failure to provide an identification until the boarding party was almost upon her, to have a reasonable suspicion that the *Marilyn E* was a "stateless" vessel. We do not see that a last minute cry of Jamaican homeport, taking into account the circumstances which preceded it, suddenly rendered the Coast Guard's suspicions of statelessness unfounded. The boarding was fully justified under the powers given to the Coast Guard by 14 U.S.C. § 89(a).

It is important to distinguish between the reasonable suspicion of statelessness needed in order to board and conduct an administrative investigation under section 89(a) and the ultimate finding that a "vessel [is] assimilated to a vessel without nationality," for jurisdictional purposes under 46 U.S.C.App. § 1903(c)(1). The first requirement goes merely to the reasonableness of the boarding and administrative search. *United States v. Wright–Barker*, 784 F.2d 161, 176 n. 13 (3rd Cir.1986). The second goes to the ultimate authority of the United States to prosecute and convict under its laws, and must be proven beyond a reasonable doubt. *United States v. Cuevas-Esquivel*, 905 F.2d 510 (1st Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 208, 112 L.Ed.2d 169 (1990) ("stateless" for purposes of jurisdiction). *Potes*, 880 F.2d at 1478, n. 1. An initial suspicion of statelessness which justifies a boarding may evaporate as documents are checked and questions are asked. It may turn out that the suspicion, although reasonable prior to the boarding, is unfounded after the boarding. An on-board emergency, for instance, may have caused a failure to answer Coast Guard communications or fly a flag for a finite period.

## VI.

### *Search of the Hold*

Once the Coast Guard was legally aboard the vessel, the master, petitioner here, gave consent to open the hold where the marijuana was found. He cannot complain now about the fruits acquired from the investigation he authorized.

In any event, it is likely that petitioner has no standing to challenge the introduction of the marijuana since he had no privacy interest in the hold of the ship. *United States v. Marsh*, 747 F.2d 7 (1st Cir.1984). The First Circuit recognizes a limited expectation of privacy in the common areas of a ship, and generally limits the zone within which one has a reasonable expectation of privacy to the crew's living quarters or personal effects. *Id.*, at 11.

Finally, the search would have been authorized absent consent. Where reasonable grounds to suspect criminal activity arise during an administrative stop and investigation, the Coast Guard may go on to conduct a search consonant with the suspicion raised. *United States v. Elkins*, 774 F.2d 530 (1st Cir.1985); *Williams*, 617 F.2d at 1087; *Marsh*, 747 F.2d at 7; *United States v. Burke*, 716 F.2d 935, 938 (1st Cir.1983). Here, the evidence that might have raised a reasonable suspicion included the evasive attitude of the crew of the *Marilyn E* prior to boarding, the lack of proper documentation following the boarding, the general state of disrepair, lack of equipment for fishing, refrigeration, ice, or back-up equipment. The "search", which consisted of opening up the hold, was justified.

In summation, the stop and boarding of the *Marilyn E* were justified by a reasonable suspicion that the ship was a "state-

less" vessel, and therefore subject to jurisdiction of the United States. The search on board was consensual and would be justified by a reasonable suspicion of wrongdoing in the absence of consent. Even if the search was somehow illegal, this petitioner has no protected privacy interest which would trigger the remedy of exclusion.

## VII.

### *Ineffective Assistance*

Petitioner claims ineffective assistance of counsel in that: 1) his trial attorney, who filed a notice of appeal, failed to perfect, resulting in a dismissal of the appeal on November 16, 1988 by the First Circuit clerk for failure to prosecute (Local Rule 45), and 2) his trial attorney failed to file a Rule 35 motion to reduce sentence.

A criminal defendant is entitled to counsel on his first appeal of right as a matter of constitutional law. *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). Here, the claimant alleges that he fully expected that his court-appointed attorney, who filed a notice of appeal on his behalf, was going to perfect the appeal. Four months after the appeal had been dismissed, petitioner's trial attorney filed an affidavit stating that he had been dismissed by petitioner who "would either retain counsel or request the appointment of counsel for his appeal."

A factual issue exists, therefore, as to whether appointed trial counsel, Victor Amador, was in fact dismissed by his client, petitioner here, or whether he simply failed to perfect a timely appeal.[7] In the case of the former, the petitioner's failure to obtain private counsel after dismissing his court-appointed attorney would divest him of any power to argue for reinstatement. *López–Torres v. United States,* 876 F.2d 4 (1st Cir.1989) ("[d]efendant cannot, by means of a § 2255 proceeding, revive rights lost by a voluntary failure to appeal"). In the latter case, the attorney's

actions are at least highly unprofessional, leading us to an inquiry into whether the appeal here should be reinstated due to ineffective assistance. We assume for sake of this opinion that the factual issue is resolved in favor of the petitioner, and that the failure to appeal was professional error on the part of his attorney. Since we assume the factual issue in plaintiff's favor, and in light of the fact that this court conducted the trial in this matter and is very familiar with the proceedings that led to the conviction under attack, we need hold no hearing on the current motion. *Machibroda v. United States,* 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); *Ouellette v. United States,* 862 F.2d 371 (1st Cir.1988) (absent compelling reasons to the contrary, no hearing required on 2255 motion submitted to trial judge already personally familiar with case).

The government argues that we do not have the jurisdiction to entertain the request for a reinstatement of the appeal under 28 U.S.C. § 2255. The government correctly points out that in *United States v. Winterhalder,* 724 F.2d 109 (10th Cir. 1983), the Tenth Circuit held that the district court lacked the authority to reinstate an appeal, and the matter should have been before the court of appeals.

Unhappily for the government, First Circuit precedent controls the result here. In *López–Torres v. United States,* 876 F.2d 4 (1st Cir.1989), the Circuit affirmed the district court's disposition, on a § 2255 motion, of petitioner's complaint of ineffective assistance for failure to perfect an appeal. The circuit held that no reinstatement of appeal is required where the government can prove, in opposition to the § 2255 motion, that the appeal would have lacked merit. The First Circuit court that decided *López–Torres* was aware of precedent like *Winterhalder,* since *Winterhalder* is cited in the *López–Torres* decision. Since the circuit failed to challenge the district's court power to entertain and refuse the request for a reinstatement, we can as-

---

**7.** We note that the attorney never filed a formal notice to the court that he was withdrawing as counsel until *after* the appeal had been rendered

untimely, and has submitted no documents which indicate that he informed his client in writing that he would not pursue the appeal.

sume that such power was properly exercised.[8]

There is another reason for which an appeal should not be reinstated here. Even an unjustified failure to appeal may not require reinstatement of the appeal where the would-be appellant has another adequate route to air his complaints, and the failure to appeal would result in no prejudice. In *Gardner v. Ponte*, 817 F.2d 183 (1st Cir.), *cert. denied, Gardner v. Maloney*, 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 134 (1987) James Gardner was convicted in a Massachusetts state court for murder. His attorney filed a notice of appeal but failed to perfect, resulting in a dismissal for failure to prosecute. Mr. Gardner, through new counsel, then filed in state court for post-conviction relief, raising all the issues that he would have raised on direct review. His attacks on the conviction were rejected at all three stages of the state court process, and he eventually filed in federal court for a writ of habeas corpus. The First Circuit held that the collateral attack procedures were sufficient to insure that any issues which would have been dealt with on appeal received adequate review, and that Mr. Gardner suffered no prejudice from his original counsel's failure to perfect.

Although we acknowledge that there is a distinction from *Gardner* in that Mr. Gardner's post-conviction motions were filed with the assistance of counsel, whereas the petitioner here proceeds *pro se*, we have searched the record in this case carefully with an eye to potential issues, and we have endeavored, in writing today's decision, to investigate all legal arguments which we see available to petitioner here. We believe that petitioner is being afforded a full opportunity to vitiate during the collateral appeal process any prejudice caused by the lost appeal. That vitiation begins with our opinion today and will continue if petitioner chooses to appeal today's deci-

sion. Therefore, either the appeal would have lacked merit, or any potentially meritorious claims which would have been raised on appeal can be dealt with adequately in this collateral attack. In any event, we believe reinstatement of the direct appeal would be an empty gesture.

### VIII.

#### *Rule 35*

Petitioner claims ineffective assistance of counsel in failure to file a Rule 35 motion for reduction of sentence. The sentencing guidelines were properly applied here, and there was no basis for petitioner's attorney to make such a motion.

### IX.

#### *Conclusion*

The petition is DENIED in all respects. IT IS SO ORDERED.

---

8. We take no position on whether, if a district court has reason to believe that the appeal would have had merit (and presumably that the loss of the right to appeal was prejudicial) the district court would have the power to issue the reinstatement order, or whether the petitioner would then have to take the district court's findings to the circuit for the order itself.