James SINGLETON, Plaintiff, Appellant,

v.

UNITED STATES of America,
Defendant, Appellee.

No. 92–1647.

United States Court of Appeals,
First Circuit.

Heard Aug. 2, 1993.

Decided June 10, 1994.

Richard J. Shea, Boston, MA, for appellant.

Carlos A. Pérez, Asst. U.S. Atty., with whom Daniel F. Lopez–Romo, U.S. Atty., and José A. Quiles–Espinosa, Senior Litigation Counsel, Hato Rey, PR, were on brief, for appellee.

Before SELYA, CYR and BOUDIN, Circuit Judges.

CYR, Circuit Judge.

Petitioner James Singleton appeals from a district court order dismissing his motion for post-conviction relief, *see* 28 U.S.C. § 2255, from a judgment of conviction for possessing marijuana, with intent to distribute, in violation of the Maritime Drug Law Enforcement Act (MDLEA).[1]  *See* 18 U.S.C. § 2; 46 U.S.C.App. § 1903(a), (c), (f).  Along with a surfeit of lesser grounds, we must assess whether Singleton was denied effective assis-

tance, *see Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), based on trial counsel's failure to object to a jury instruction which effectively directed a verdict on an essential element of the crime charged.  We affirm the district court judgment.

## I

### BACKGROUND

Shortly after midnight on January 5, 1988, the United States Coast Guard Cutter DAUNTLESS made radar contact with a vessel approaching on the high seas from the direction of Haiti.  Suspecting that the vessel might contain illegal Haitian immigrants, the DAUNTLESS attempted to establish radio communication, but to no avail.  Shortly thereafter, Coast Guard Ensign Pulver approached to within thirty yards of the unidentified vessel in a boarding craft, and noted the name MARILYN E and the letters "KA" and "JN" on the stern but no home port designation or flag.  Pulver made voice contact with a person aboard the MARILYN E who explained that the vessel was en route from Kingston Bay, Jamaica, and bound for Kaison Bank, in the Bahamas, to fish.  Ensign Pulver obtained consent to board the MARILYN E from codefendant Willey Gordon, the master.  Pulver and the boarding crew found Gordon, Singleton and four others on board the MARILYN E.  The MARILYN E was leaky and in serious disrepair.  The scant fishing gear on board was inoperable and the vessel was not provisioned for an extended voyage.

Shortly after boarding, Pulver asked the master for the certificate of documentation.  Gordon asserted that though the MARILYN E was of Jamaican registry, she was carrying no documentation.  At that point, codefendant Earl McLeish volunteered that he knew where the documentation papers were kept, and soon produced a Coast Guard "bill of sale" form and an expired United States

---

1. Singleton's conviction was upheld on direct appeal in *United States v. Doe,* 921 F.2d 340 (1st Cir.1990).

Certificate of Documentation.[2] Asked what was in the hold, Gordon responded that it contained ice. Whereupon Pulver requested and received permission to open the hold, which was found to contain bales of marijuana weighing approximately 3,750 pounds.[3]

Ensign Pulver requested authorization from the Commander of the DAUNTLESS to arrest the captain and crew of the MARILYN E. But because the procedures to be followed in arresting the crew, and seizing the vessel, would depend on the nationality of the MARILYN E, Pulver continued to question Gordon. Asked whether there were any flags aboard the MARILYN E, Gordon at first said there were none, but then corrected himself by saying he believed there was one flag forward. Upon overhearing Ensign Pulver's question to Gordon, Singleton located a United States flag and a plain yellow quarantine flag in the fore of the vessel.[4] Thus, it remained unclear whether the MARILYN E was a United States vessel, as the United States flag and the dated documentation papers suggested, a Jamaican vessel, as Gordon claimed, or a stateless vessel.

In order to ensure the legality of the ensuing arrests and seizure, Ensign Pulver initiated a formal request to obtain Jamaican consent to the enforcement of United States

drug laws aboard the MARILYN E,[5] and simultaneously sought authorization from the Coast Guard Commandant in Washington, D.C. Several hours later, with authorization from the Coast Guard Commandant and the consent of the Jamaican government, the six persons on board the MARILYN E were arrested and transferred to the DAUNTLESS, whereupon Miranda warnings were administered to each. Shortly thereafter, the Coast Guard Cutter MOHICAN rendezvoused with the DAUNTLESS, took custody of the MARILYN E, and set out to tow her to Puerto Rico. The MARILYN E proved unseaworthy, however, and she sank (with most of her illicit cargo) en route.

## II

### DISCUSSION

### A. The Erroneous Jury Instruction

Singleton contends that the trial judge effectively withdrew from the jury a material element of the crime charged under 46 U.S.C.App. § 1903(a); viz., whether the MARILYN E was "a vessel subject to the jurisdiction of the United States," within the meaning of the MDLEA.[6] The jury was instructed as follows:

2. Though both documents suggested United States registry, neither the bill of sale nor the expired certificate of documentation constituted proper documentation of registry. The bill of sale memorialized a 1986 sale of the MARILYN E by one Clyde Randolph Eubanks to one Hubert Henderson, and was acknowledged in Cateret County, North Carolina. The certificate of documentation was registered to Eubanks but had expired more than one and one-half years earlier.

3. To this point, Singleton's only statement to the Coast Guard had been: "I'm James Singleton and I'm from the United States."

4. Our opinion on direct appeal merely stated that the flag was yellow. Doe, 921 F.2d at 342. The district court opinion dismissing appellant's section 2255 motion states that "[t]he yellow flag was later identified as being a flag from Quebec." Singleton v. United States, 789 F.Supp. 492, 494 (D.P.R.1992). The confusion is entirely understandable, but we note that the yellow flag in question is a signalling flag indicating "quarantine." Howard L. Andrews & Alexander L. Russell, Basic Boating: Piloting and Seamanship 65 (2d ed. 1974). In nautical circles, it is known,

colloquially, as "Quebec," the international phonetic representation for the letter "Q," see The ARRL Handbook for the Radio Amateur 38–4 (Kirk A. Kleinschmidt ed.) (67th ed. 1990).

5. Had Gordon's unsubstantiated claim of Jamaican registry proven valid, Jamaican "consent" would have been necessary to secure jurisdiction under the criminal statute pursuant to which Singleton and the other defendants were indicted. See 46 U.S.C.App. § 1903(c)(1)(C) (authorizing enforcement of United States drug laws on, inter alia, "a vessel registered in a foreign nation where the flag nation has consented or waived objection to the enforcement of United States law by the United States").

6. At the time of Singleton's arrest and conviction, the MDLEA provided:

It is unlawful for any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance. 46 U.S.C.App. § 1903(a) (Supp.1987). A subsequent amendment extended jurisdiction over a

Well, in this particular case, one of the elements that you will have to decide is whether this was a vessel of the United States and *there is no real controversy in my own mind about that.* The parties, *the evidence is there.* There is [sic] exhibits that tell you that *this vessel was registered, documented in the United States . . . .*

[46 U.S.C.App. § 1903] says basically this, it is unlawful for any person on board a vessel of the United States or on board a vessel subject to the jurisdiction of the United States and in this particular case, I already pointed to you out [sic] the fact that there is *no real controversy about that fact* ... That is what you have to decide, possess with the intent to manufacture and distribute a controlled substance and then sub-section C is the one that defines a vessel subject to the jurisdiction of the United States and *I have already told you that the Marilyn E,* with the papers that we have on hand, *is a vessel subject to the jurisdiction of the United States . . . .*

... If I were to read the elements of this offense, I would tell you as follows: I would tell you that you would have to find in each particular case that each defendant was located on board a vessel subject to the jurisdiction of the United States when this happened . . . .

(Emphasis added.) [7]

In its ruling dismissing Singleton's section 2255 motion, *see Singleton v. United States,* 789 F.Supp. 492, 495 (D.P.R.1992), the district court recognized the fair import of the challenged instruction to be that the jurisdictional element of the crime charged had been established to the satisfaction of the court. *See United States v. Potes,* 880 F.2d 1475, 1478 n. 1 (1st Cir.1989) ("Because this jurisdictional requirement was an element of the

offense, and because it depended upon factual as well as legal determinations, it was for the jury to decide whether it had been satisfied."). The district court ruled, nonetheless, that any error was harmless. *Id.* at 501–04.[8] On appeal, Singleton insists that this instructional error could not have been harmless since it relieved the jury of *its* responsibility to determine whether the government had proven an essential element of the crime beyond a reasonable doubt.

We observe at the outset that the established "principle that collateral review is different from direct review resounds throughout our habeas jurisprudence." *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1719, 123 L.Ed.2d 353 (1993). A presumption of finality attaches to criminal convictions once all direct appeals have been exhausted. *Barefoot v. Estelle,* 463 U.S. 880, 887, 103 S.Ct. 3383, 3391–92, 77 L.Ed.2d 1090 (1983); *United States v. Frady,* 456 U.S. 152, 164–65, 102 S.Ct. 1584, 1592–93, 71 L.Ed.2d 816 (1982). Postconviction relief on collateral review is an extraordinary remedy, available only on a sufficient showing of fundamental unfairness. *Brecht,* —— U.S. at ——, 113 S.Ct. at 1719. Trial errors, even those that implicate Seventh Amendment concerns, are subject to stringent "harmless error" review in a collateral proceeding. *Id.* at ——, 113 S.Ct. at 1723 (Stevens, J., concurring).

We recently had occasion to survey the developing "harmless error" jurisprudence in a section 2254 case where the petitioner sought to overturn his state court conviction on the basis of an erroneous jury instruction. *See Libby v. Duval,* 19 F.3d 733, 738–40 (1st Cir.1994). In *Libby,* we identified the appropriate "harmless error" inquiry as whether the government can demonstrate that the erroneous instruction "did not have a substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 738

---

"citizen of the United States ... aboard any vessel." *See* Pub.L. 100–690, § 7402(a), Oct. 21, 1988, 102 Stat. 4181 (amending 46 U.S.C.App. § 1903(a)).

**7.** Singleton's trial counsel neither requested an instruction on the jurisdictional element, nor objected to the instruction given.

**8.** The harmlessness ruling was based on the conclusion that the MARILYN E was a "vessel of the United States" under 46 U.S.C. § 12111(c)(1), which provides that "until a certificate of documentation is surrendered with the approval of the Secretary, a documented vessel is deemed to continue to be documented . . . ." The government concedes that the quoted provision was enacted after these events took place.

& n. 15; *see also Brecht,* —— U.S. at ——, 113 S.Ct. at 1722 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)).[9] The "actual prejudice" review required under *Brecht* must encompass the *record as a whole. Id.; Libby,* 19 F.3d at 740. Under the well-seasoned *Kotteakos* standard, therefore, trial error is deemed harmless only if the record as a whole permits the reviewing court to conclude:

> "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." [*Kotteakos,* 328 U.S. at 765, 66 S.Ct. at 1248. This test] "is satisfied if it is 'highly probable' that the challenged action did not affect the judgment." *United States v. Hernandez–Bermudez,* 857 F.2d 50, 53 (1st Cir.1988).

*United States v. Wood,* 924 F.2d 399, 402 (1st Cir.1991) (quoting *United States v. Ladd,* 885 F.2d 954, 957 (1st Cir.1989)). Thus, the Singleton conviction can withstand collateral review only if it is determined, based on the entire trial record, that the government has demonstrated that a reasonable jury would have found that the jurisdictional element required for conviction under section 1903 was established beyond a reasonable doubt notwithstanding the erroneous instruction.

■ The present inquiry under *Kotteakos* and *Brecht* requires close examination of the MDLEA and its jurisdictional predicates. The MDLEA in force in January 1988 proscribed possession, with intent to distribute, marijuana "on board a vessel of the United States *or* a vessel subject to the jurisdiction of the United States." 46 U.S.C.App.

§ 1903(a) (Supp.1987) (emphasis added). Section 1903(c) provides in pertinent part that the term "vessel subject to the jurisdiction of the United States" includes:

> (A) A vessel without nationality;
>
> (B) A vessel assimilated to a vessel without nationality, in accordance with Article 6(2) of the 1958 Convention on the High Seas; and
>
> (C) A vessel registered in a foreign nation where the flag nation has consented or waived objection to the enforcement of United States law by the United States.

*See* 46 U.S.C.App. § 1903(c). Thus, jurisdiction would exist under the MDLEA if the MARILYN E were (1) American, as a vessel of the United States; (2) Jamaican, since Jamaican authorities consented to her boarding; (3) a vessel without nationality; or (4) a vessel assimilated to a vessel without nationality.[10]

Section 1903(c)(1)(B) provides that a "vessel assimilated to a vessel without nationality" in accordance with Article 6(2) of the Convention on the High Seas comes within the ambit of the MDLEA. *United States v. Passos–Paternina,* 918 F.2d 979, 982 (1st Cir.1990), *cert. denied,* 499 U.S. 982, 111 S.Ct. 1637, 113 L.Ed.2d 732 (1991), *and cert. denied* 501 U.S. 1210, 111 S.Ct. 2809, 115 L.Ed.2d 981 (1991). Article 6(2) provides that "[a] ship which sails under the flags of two or more States, using them according to convenience, may not claim any nationalities in question with respect to any other state, and may be assimilated to a ship without nationality." Convention on the High Seas, Art. 6(2), *opened for signature,* Apr. 29, 1958, 13 U.S.T. 2312, T.I.A.S. No. 5200, *quoted in*

---

9. *Libby* and *Brecht* arose under 28 U.S.C. § 2254. Thus, one significant element in the rationale underlying *Brecht*—namely, comity concerns based in federalism—is plainly lacking in a collateral proceeding arising under 28 U.S.C. § 2255. Nevertheless, we think the *Brecht* rationale—*fundamentally* anchored in traditional concerns for finality—operates with like vigor in the federal habeas context: "granting habeas relief merely because there is a 'reasonable possibility' that trial error contributed to the verdict, *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 is at odds with the historic meaning of habeas corpus—to afford relief to those whom society has 'grievously

wronged.'" *Brecht,* —— U.S. at ——, 113 S.Ct. at 1721 (secondary citations omitted).

10. The trial record amply supports the district court finding that section 1903 jurisdiction was never contested at trial. Indeed, the government and the defendants paid little attention to it. Although there can be no doubt that the jury instruction was premised, however improvidently, on the correct impression that section 1903 jurisdiction was a non-issue as far as the parties were concerned, this weakness in the government's trial presentation is no less vigorously pressed on collateral review.

*United States v. Ayarza–Garcia*, 819 F.2d 1043, 1046–47 (11th Cir.), *cert. denied*, 484 U.S. 969, 108 S.Ct. 465, 98 L.Ed.2d 404 (1987); *see also United States v. Garate–Vergara*, 942 F.2d 1543, 1554–55 (11th Cir. 1991), *modified*, 991 F.2d 662 (11th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 481, 126 L.Ed.2d 432 (1993); *Passos–Paternina*, 918 F.2d at 982 ("the clear purport of [Article 6(2) ] requires that a vessel which sails under the authority of two or more nations be considered 'assimilated to a vessel without nationality.' "). In the context of the MDLEA, Article 6(2) is broadly interpreted, and reaches beyond the literal thrust of its "flying two flags" language to encompass conduct amounting to conflicting claims of nationality. *Id.* (surveying cases).

As to the registry of the vessel, the record reveals that Captain Gordon was evasive, claiming at various times that the MARILYN E carried neither flags nor documentation. Although the captain asserted that the MARILYN E was of Jamaican registry, and a crew member claimed to have sailed out of Kingston Bay, the scant documentation, and the only flags found on board, suggested United States registry. Further, the MARILYN E was not flying the flag of any nation at the time she was sighted, nor did she bear her home port designation or other registry information. *See United States v. Matute*, 767 F.2d 1511, 1513 (11th Cir.1985) (finding absence of home port designation "a clear indication that the crew wanted to be able to manipulate the vessel's 'nationality' on short notice"). Section 1903(c)(1)(B) was meant to encompass this precise sort of ambivalent behavior. *See id.* (holding that use of Colombian flag and Venezuelan registry papers is "precisely" what statute and Article 6(2) contemplated); *Passos–Paternina*, 918 F.2d at 981–83 (holding that conflicting claims of registry and carrying different flags "were tantamount to sailing under the authority of more than one nation under convenience").

The uncontroverted evidence that the captain and crew repeatedly provided the Coast Guard with equivocal and contradictory registry information satisfies us that a properly instructed jury would have concluded that the United States met its burden of proving, beyond a reasonable doubt, that the MARILYN E was a "vessel subject to the jurisdiction of the United States" within the meaning of 46 U.S.C. § 1903.

### B.  *Ineffective Assistance of Counsel*

The Sixth Amendment provides that criminal defendants are entitled to the effective assistance of trial counsel. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. "But 'the Constitution does not guarantee a defendant a letter-perfect defense or a successful defense; rather the performance standard is that of reasonably effective assistance under the circumstances then obtaining.' " *Lema v. United States*, 987 F.2d 48, 50 (1st Cir.1993) (quoting *United States v. Natanel*, 938 F.2d 302, 309–10 (1st Cir.1991)). "The habeas court must evaluate the [challenged] conduct from counsel's perspective at the time, considering the totality of the circumstances before it, and making every effort to eliminate the distorting effects of hindsight." *Id.* (citations and quotations omitted). We indulge "a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id.* (citing *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065). Besides bearing the burden of proving that trial counsel's performance was not within this wide range of reasonable professional assistance, Singleton must establish that counsel's performance was sufficiently prejudicial to undermine confidence in the outcome of the trial. *Strickland*, 466 U.S. at 693–94, 104 S.Ct. at 2067–68. Singleton asserts prejudice from several alleged lapses on the part of trial counsel.[11]

First, he points out that trial counsel did not attempt to suppress the evidence seized aboard the MARILYN E. The uncontroverted record evidence reveals, however, that the master of the MARILYN E consented to the Coast Guard boarding. Moreover, the MARILYN E was subject to boarding simply on the basis of a reasonable pre-

---

11. As it resulted in no "prejudice" within the meaning of *Strickland*, *see supra* pp. 235–238, we need give no further consideration to the "ineffective assistance" claim that trial counsel failed to challenge the jury instruction on section 1903 jurisdiction.

boarding suspicion that she was a stateless vessel. *See United States v. Alvarez–Mena*, 765 F.2d 1259, 1268 (5th Cir.1985) ("Coast Guard need have only a 'reasonable suspicion' that a vessel is subject to United States law before effecting a seizure of the vessel in international waters."); *accord Potes*, 880 F.2d at 1478 (dicta). As the MARILYN E flew no flag, bore no home port designation, and could not be raised by radio, there was an adequate basis for the reasonable suspicion needed to stop and board her. *See Alvarez–Mena*, 765 F.2d at 1268 (finding abundant reasonable suspicion where, *inter alia*, vessel "flew no flag, and had no stern markings indicating home port or country"). And, of course, Ensign Pulver obtained Captain Gordon's permission before opening the hold.

■ Second, Singleton claims prejudice from counsel's failure to challenge the adequacy of the *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The crew received *Miranda* warnings just prior to their transfer to the DAUNTLESS, moments after their arrests. Although he did speak with Coast Guard personnel before being formally arrested, Singleton has not identified any evidence illegally obtained prior to receiving *Miranda* warnings. Our review suggests but one possibility; *viz.*, Singleton's admission that he was "from the United States," *see supra* note 3. But the uncontroverted testimony of Ensign Pulver makes clear that Singleton volunteered this admission. Thus, even assuming that Singleton was in "custody," this statement was not made in response to interrogation. *See Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624 (rule applies to "in-custody interrogations"). We find no colorable basis for a cognizable *Miranda* claim.

■ Third, Singleton faults counsel's failure to move for a separate trial. As a general rule, joinder for trial is proper if issues of fact and law overlap and the practical benefits of a joint trial outweigh each defendant's interest in a separate trial. *See,*

*e.g., United States v. Arruda*, 715 F.2d 671, 677–81 (1st Cir.1983). Singleton has not demonstrated that counsel's failure to press for a separate trial was outside the wide range of reasonable professional assistance.

Significantly, codefendant McLeish unsuccessfully moved for severance early in the proceedings. Like Singleton, McLeish pursued a "hitchhiker" defense, claiming that he had been picked up serendipitously by the MARILYN E while adrift at sea. In light of the lack of success with which McLeish's request for severance was met, we cannot say that trial counsel's performance was deficient under the Sixth Amendment. *See United States v. Pellerito*, 878 F.2d 1535, 1540 (1st Cir.1985) (codefendants' failed efforts are relevant in assessing other counsel's decision not to pursue similar tactics). Indeed, the McLeish motion bears all the earmarks of a stalking-horse strategy. "Effectiveness does not require that counsel jump through every conceivable hoop, or engage in futile exercises." *Id.* (citing *United States v. Cronic*, 466 U.S. 648, 656 n. 19, 104 S.Ct. 2039, 2045 n. 19, 80 L.Ed.2d 657 (1984) ("useless charade" not required); *United States v. Levy*, 870 F.2d 37, 38 (1st Cir.1989) (similar)). In any event, there has been no showing of prejudice to Singleton resulting from the joint trial.

### C. *Defaulted Claims*

■ Several additional claims advanced by Singleton suffer from various forms of procedural default, and essentially represent attempts to recast arguments already rejected in connection with the "ineffective assistance" claim.[12] Singleton attempts, to no avail, *see Lopez–Torres v. United States*, 876 F.2d 4, 5 (1st Cir.), *cert. denied*, 493 U.S. 979, 110 S.Ct. 508, 107 L.Ed.2d 510 (1989), to revisit the defaulted claim relating to improper joinder for trial, though it was neither raised before the trial court nor on direct appeal. Furthermore, Singleton challenges his 360–month sentence as having been based on a sentencing guideline determination that he was responsible for possessing, with intent to

---

**12.** The defaulted claims include an attempt to raise the groundless *Miranda* claim. *See supra* p.

239.

distribute, 3,750 pounds of marijuana, whereas there was no evidence that he knew the weight, and no evidence that the bales lost at sea contained marijuana. Not only was a substantially similar argument rejected on direct appeal, *see Doe,* 921 F.2d at 347, but "[i]ssues disposed of in a prior appeal will not be reviewed again by way of a 28 U.S.C. § 2255 motion," *Dirring v. United States,* 370 F.2d 862, 864 (1st Cir.1967), *cited in Barrett v. United States,* 965 F.2d 1184, 1190 n. 11 (1st Cir.1992). Additionally, this argument does not appear in the section 2255 motion, but first emerged in Singleton's supplemental appellate brief. *See Dziurgot v. Luther,* 897 F.2d 1222, 1224 (1st Cir.1990) (holding claims not raised in section 2255 motion will not be reviewed on appeal). Finally, further review of Singleton's challenge to the sufficiency of the evidence, addressed and rejected on direct appeal, *Doe,* 921 F.2d at 346, is also foreclosed, *Tracey v. United States,* 739 F.2d 679, 682 (1st Cir.1984).

***Affirmed.***