Bennett v. State of NH                    CV-00-507-B    06/06/01

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Eric Bennett

   v.                                    Civil No. 00-507-B
                                          2001DNH111
State of New Hampshire

**MEMORANDUM AND ORDER**

Petitioner Eric Bennett, pro se, is currently serving a
sentence of fifteen to thirty years in the New Hampshire State
Prison for manslaughter.  He has petitioned this Court for a writ
of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that: (1)
the trial court erred in admitting into evidence statements that
Bennett made to the police prior to having been given a Miranda
warning; (2) his trial counsel were ineffective; and (3) the
prosecution engaged in misconduct.  Because I conclude that
Bennett's arguments lack merit, I dismiss his petition.

## I. BACKGROUND[1]

On the evening of August 3, 1996, Bennett, his girlfriend
Jennifer Bohl, and a number of friends gathered at Bohl's
apartment in Weare, New Hampshire.  The group eventually left the

_____

[1] I take the facts from the parties' briefs and the
transcript of the trial.

apartment and went to a bar in Concord, but returned, in part, because Bennett was intoxicated.

Bennett consumed several shots of vodka at Bohl's apartment and later fell asleep on her bed. While Bennett slept, Bohl and her remaining friends went to a party in a nearby town where they encountered Douglas Goodman. After Bohl expressed concern that Bennett was asleep in her bed, Goodman, an acquaintance of Bennett, offered to return to Bohl's apartment with her and drive Bennett to his home in Manchester.

Bohl and Goodman returned to Bohl's apartment, woke Bennett and convinced him to get into Bohl's car. Eventually, Bennett got into the back seat and pretended to fall asleep. Goodman sat in the front passenger seat. On the way to Bennett's home, Bennett suddenly put his right arm around Goodman's throat and began to choke him. Bennett also put his left hand around his right wrist to strengthen his hold on Goodman's neck. As Bennett held Goodman against the passenger seat, Goodman struggled to breathe. Bohl stopped the car and screamed at Bennett to stop. Bennett responded by extending his leg forward into the front of the car, onto the steering column and against the horn, thereby obtaining more leverage on Goodman.

The sound of the horn, and the voices of Bohl and Bennett, awakened Sandra Chabot, who lived nearby. Chabot called the police at 1:01 a.m.

Officer Lisa Mackey of the Goffstown Police Department arrived on the scene approximately ten minutes after Chabot's call. As Officer Mackey approached the car she observed that Bennett was still strangling Goodman. Officer Mackey asked Bennett three times to stop, but he refused to do so until Officer Mackey drew her gun and aimed it at Bennett.

Goodman died that morning. An autopsy revealed that Goodman had died as a result of strangulation.

Bennett was charged with second-degree murder. A jury in Hillsborough County Superior Court-Northern District convicted Bennett of the lesser-included offense of manslaughter. On appeal, the New Hampshire Supreme Court affirmed his conviction. See New Hampshire v. Bennett, 737 A.2d 640, 647 (N.H. 1999).

Bennett subsequently filed a motion for a new trial with the Hillsborough County Superior Court, raising many of the same allegations of prosecutorial misconduct and ineffective assistance of counsel he asserts in his habeas corpus petition. See Mot. for New Trial, Exh. A. to State's Answer for Writ of

Habeas Corpus ("State's Answer"), (Doc. No. 9), at 27-30 (prosecutorial misconduct), 30-33 (ineffective assistance of counsel). The court denied Bennett's motion, as well as his subsequent motion to reconsider, without comment. See Order of March 14, 2000, Exh B. to State's Answer ("Defendant's motion for new trial is denied."); Order of April 15, 2000, Exh. D. to State's Answer ("The Motion to Reconsider is Denied."). Bennett then filed a notice of appeal to the New Hampshire Supreme Court which declined to review the trial court's ruling. Bennett subsequently filed the instant petition for a writ of habeas corpus.

## II. STANDARD OF REVIEW

I may grant Bennett's petition for a writ of habeas corpus only if the adjudication of his claims in state court: (1) "resulted in a decision that was contrary to . . . clearly established [f]ederal law, as determined by the Supreme Court of the United States;" or (2) "involved an unreasonable application" of such law. 28 U.S.C. § 2254(d) (2000); see Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000) (interpreting § 2254(d)); Williams v. Matesanz, 230 F.3d 421, 424-26 (1st Cir. 2000). In this

context, "clearly established federal law, as determined by the Supreme Court of the United States" refers to the holdings of the Supreme Court as of the time of the relevant state-court decision. See Taylor, 120 S.Ct. at 1523.

Accordingly, I must first ascertain whether the state court's decision, as to each claim raised by the petitioner, was contrary to relevant Supreme Court precedent. See Taylor, 120 S.Ct at 1519; Matesanz, 230 F.3d at 426 (applying Taylor). A decision is contrary to Supreme Court precedent if the state court: (1) applied a rule that contradicts the governing law set forth by the Supreme Court; or (2) reached a different result than that reached by the Supreme Court in a case involving materially indistinguishable facts. See Taylor, 120 S.Ct. at 1519-20; Matesanz, 230 F.3d at 424-25 (comparing Taylor with O'Brien v. Dubois, 145 F.3d 16 (1st Cir. 1998)); see also Ramdass v. Angelone, 120 S.Ct. 2113, 2120 (2000) (plurality opinion of Kennedy, J.). In essence, this initial inquiry requires the petitioner to show that "Supreme Court precedent requires an outcome contrary" to that reached by the state court. Matesanz, 230 F.3d at 425 (quoting O'Brien, 145 F.3d at 24-25).

-5-

If the state court's decision was not contrary to Supreme Court precedent, I must then ask whether the state court's decision involved an "objectively unreasonable" application of clearly established federal law, as determined by the Supreme Court. See Taylor, 120 S.Ct. at 1519, 1521-22; Phoenix v. Matesanz, 233 F.3d 77, 80-81 (1st Cir. 2000); Matesanz, 230 F.3d at 425. A decision is not objectively unreasonable solely because I conclude that the state court applied the law erroneously or incorrectly. See Taylor, 120 S.Ct. at 1521-23. Rather, to be objectively unreasonable, the state court's application of law must be so erroneous or incorrect as to fall "outside the universe of plausible, credible outcomes." Matesanz, 230 F.3d at 425 (quoting O'Brien, 145 F.3d at 25); see Taylor, 120 S.Ct. at 1521-22 (rejecting the "reasonable jurist" standard as impermissibly subjective).

In reviewing a petition for a writ of habeas corpus, a federal court must accept the state court's resolution of the factual issues unless the petitioner can establish by clear and convincing evidence that the state court determined the facts incorrectly. See 28 U.S.C. § 2254(e)(1). I apply these standards in reviewing Bennett's petition.

# III. **DISCUSSION**

Bennett argues that: (1) the trial court erred in admitting into evidence statements that Bennett made to the police prior to having been given a <u>Miranda</u> warning; (2) his trial counsel were ineffective; and (3) the prosecution engaged in misconduct. I address each of Bennett's arguments in turn.

## A. **Bennett's Statements to the Police**

Bennett argues that the trial court erred in admitting into evidence statements that Bennett made to the police prior to having been given a <u>Miranda</u> warning.[2] Because the contested statements were not the product of custodial interrogation, I reject Bennett's argument.

In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme Court held that the prosecution may not use any statement at trial that stems from "custodial interrogation" of the defendant, unless the prosecution can show that the defendant was advised of

---

[2] The Goffstown police eventually read Bennett his <u>Miranda</u> rights at the police station the morning of Goodman's death. Bennett waived his rights. <u>See</u> Transcript (hereinafter "<u>Tr.</u>") of jury trial, Day 4, 3-4. Subsequently, the Goffstown police taped an interview with Bennett. Bennett argues that he was intoxicated at the time, and therefore his waiver was invalid. This argument is moot because the taped interview was never admitted into evidence. <u>See</u> <u>Bennett</u>, 737 A.2d at 643 (noting that the taped statement was never admitted into evidence).

his Constitutional rights and knowingly and intelligently waived those rights and agreed to answer questions. Id. at 444; see United States v. Melendez, 228 F.3d 19, 21-22 (1st Cir. 2000). As the phrase "custodial interrogation" suggests, the exclusionary rule established by Miranda applies only when the prosecution seeks to introduce statements made by the defendant while the defendant was: (1) in custody; and (2) under interrogation. See Miranda, 384 U.S. at 444; United States v. Vega-Figueroa, 234 F.3d 744, 749 (1st Cir. 2000).

In Rhode Island v. Innis, 446 U.S. 291 (1980), the Supreme Court defined interrogation, for purposes of Miranda, to mean "express questioning or its functional equivalent." Id. at 300-01. The court defined the latter phrase to mean "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301.

Bennett identifies three statements, elicited on direct examination by the prosecution, that he feels should not have been admitted into evidence. I assume, for purposes of analysis, that Bennett was in custody when he made each of these three

statements.  The question before me then is whether he was subject to interrogation or its functional equivalent.

First, Officer Mackey testified as follows:

A: We were walking back to the second vehicle, which was
   Officer Tuttle's, and he began saying some things to me.
   He said –
Q: What did he tell you?
A: He said I killed him.  They were going to take me in the
   woods and they were going to kill me.
Q: How did you respond to that?
A: I asked him not to say anything else.  He was under
   arrest. And that he shouldn't say anything else because
   he hasn't been read his <u>Miranda</u> rights.

<u>Tr.</u>, Day 3, 143.

Second, Officer Tuttle testified as follows:

Q: What happened when you got into your cruiser that night?
A: Upon entering the cruiser the suspect identified me as
   Mr. Tuttle and said that he had had me as a substitute
   teacher at Goffstown High School.
Q: Did the defendant make any other statements to you in the
   car, in the cruiser, on the way back to the Goffstown
   Police Department that night?
A: He made some statements to me throughout the evening.
   Approximately four times he told me that or he made the
   comments, and these were voluntary comments that I did
   not solicit, that he didn't mean to kill the bastard.
   He made one comment in addition to that that said I
   didn't mean to kill the bastard, but better him than me.

<u>Tr.</u>, Day 3, 171.

Third, Officer Tuttle also testified as follows:

Q: Other than referring to Mr. Goodman as a bastard, did-
   while he was you in the processing room, did he make any

other spontaneous statements to you in a disparaging way about the victim in this case?

A: He made a statement after the telephone calls. And he talked to me about how bored he was and that he was cold and so forth.  And he said that he should be on the water instead of strangulated some asshole who needed it.

Q: Do you recall the exact words when he made that statement?

A: Yes, I do.

Q: What were the defendant's exact words when he made that statement?

A: I believe he said that he should be on the water right now instead of strangulating some asshole who needed it.

Tr., Day 3, 173.

The Supreme Court has held that "volunteered statements cannot properly be considered the result of police interrogation."  Arizona v. Mauro, 481 U.S. 520, 529 (1987).  Accordingly, any voluntary statement, regardless of its incriminatory nature, is admissible in evidence.  See id.; Oregon v. Elstad, 470 U.S. 298, 305 (1985); Innis, 446 U.S. at 299-300 ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." (quoting Miranda, 384 U.S. at 478)).

In this case, the uncontroverted testimony of Officers Mackey and Tuttle establishes that Bennett spoke to them of his own volition, without any prompting.  See Singleton v. United States, 26 F.3d 233, 239 (1st Cir. 1994).  Accordingly, his

-10-

statements can not be considered to be the product of custodial interrogation or its functional equivalent.  See Mauro, 481 U.S. at 529.  Therefore, I conclude that the trial court did not err in admitting the contested statements into evidence.  See id.

**B.    Ineffective Assistance of Counsel**

Bennett argues that his trial counsel were ineffective for: (1) failing to address the Miranda issues discussed above; (2) appearing unprepared or nervous; (3) failing to object during the prosecution's direct examination of Officer Tuttle; and (4) failing to object during the prosecution's closing argument.  I address each argument in turn, after setting forth the applicable law regarding ineffective assistance of counsel claims.

To prevail on his ineffective assistance of counsel claims, Bennett must make a two-part showing.  See Strickland v. Washington, 466 U.S. 668, 687 (1984); Scarpa v. DuBois, 38 F.3d 1, 8 (1st Cir. 1994).  First, he must establish that his counsel's conduct was deficient, meaning that it was unreasonable under prevailing professional norms.  See Strickland, 466 U.S. at 688-90.  This standard is difficult to meet because reviewing courts begin with the presumption "that, under the circumstances, the challenged action might be considered sound trial strategy."

-11-

Id. at 689 (internal quotation marks and citation omitted). Bennett must overcome this deferential presumption in order to meet the first part of the test.  See id.

Second, Bennett must show his counsel's asserted deficiencies resulted in actual prejudice.  See Strickland, 466 U.S. at 687; Scarpa, 38 F.3d at 8.  In other words, he must show that there is a reasonable probability that, but for his counsel's conduct, the outcome of the trial would have been different.  See Strickland, 466 U.S. at 694; Scarpa, 38 F.3d at 8-9.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.

In reviewing Bennett's ineffective assistance of counsel claims, I need not address both parts of the test if I conclude that he cannot make a sufficient showing on one.  See id. at 697.

### 1.  The Miranda Issue

Bennett argues that his trial counsel's "failure to address the issue" of his Miranda rights constituted ineffective assistance of counsel.  Although his petition is unclear, presumably he takes issue with his trial counsel's failure to object to the admission of the three incriminating statements

-12-

Bennett made to members of the Goffstown Police Department. I reject Bennett's argument.

As discussed above, all of the contested statements were properly allowed into evidence. Accordingly, any objection to their admission would have been futile. "Effectiveness does not require that counsel jump through every conceivable hoop, or engage in futile exercises." Singleton, 26 F.3d at 239 (quoting United States v. Pellerito, 878 F.2d 1535, 1540 (1st Cir. 1985)). Therefore, I conclude that Bennett's trial counsel were not ineffective for failing to raise a meritless Miranda objection. See id. (finding no ineffective assistance of counsel for failing to raise a Miranda objection where uncontroverted testimony established that the defendant volunteered an admission to the authorities).

## 2.  Defense Counsel's Preparation and Demeanor

Bennett points to a number of occasions during the trial where his counsel appeared to be disorganized, unprepared, or confused. These statements, he argues, show that his trial counsel were ineffective.

The statements at issue include the following:

When you said on direct, and I think that you said, and I wrote it down and I always get this stuff confused. Tr., Day 2, 119.

That was a horrible question if you don't understand it. I'm going to change it. And I think we've gone over it anyway. Tr., Day 2, 132.

I apologize for the delay. I'm afraid I've become a little disorganized here, but I hope not too much. Tr., Day 2, 266.

I seem to have lost something, your Honor. If I may have a moment. Tr., Day 4, 78.

Bennett's argument fails because defense counsel need not be flawless to be effective. See, e.g., Dows v. Wood, 211 F.3d 480, 487 (9th Cir.), cert. denied, 121 S.Ct. (2000). The contested statements merely reflect the difficulty inherent in preparing, organizing, and articulately presenting a defense in a multi-day criminal trial. See id. (holding that minor mistakes evincing momentary confusion do not amount to objectively unreasonable conduct). Moreover, counsel often make self-deprecating remarks during trial in an attempt to appeal to the jury. I find no indication in the record that defense counsel failed, due to disorganization, unpreparedness or confusion, to thoroughly examine and cross-examine witnesses or otherwise advance their defense. Cf. Williamson v. Ward, 110 F.3d 1508, 1519-22 (10th

-14-

Cir. 1997) (finding trial counsel to be ineffective where a lack of investigation and preparation compromised the defense and left counsel unprepared to respond to the prosecution's objections). Nor can I conclude that Bennett suffered any prejudice because of a few verbal miscues by his trial counsel. See Strickland, 466 U.S. at 694; Scarpa, 38 F.3d at 8-9.

### 3.   The Prosecution's Examination of Officer Tuttle

Bennett claims that his trial counsel were deficient for failing to object when the prosecution allegedly elicited false testimony from Officer Tuttle on direct examination. The testimony in question relates to a phone call made by Bennett to Bohl from the police station the morning of Goodman's death. Bennett was unable to reach Bohl directly, but left a message on her answering machine. The relevant section of the direct examination is as follows:

> Q: Do you recall what message he left for the woman named Jennifer?
>
> A: The message that he left to Jennifer was, as close as I can get to what he said, was don't try that on me again. The word bitch was used relative to that conversation. It was used either when he made the call or it was used right after the call. But he did make the statement in regards to what I said.

Tr., Day 3, 172.

Bennett correctly points out that the message he left on Bohl's machine was "don't try that shit again on me, woman." See Tr., Day 2, 3. Bennett argues that this fact renders Officer Tuttle's statement false and, therefore, objectionable.

I disagree. Bennett ignores the full testimony of Officer Tuttle. Officer Tuttle testified that he recalled Bennett saying the word "bitch" either during or right after leaving the message on Bohl's answering machine. Tr., Day 3, 172. Therefore, his testimony was not necessarily false in that he could have correctly remembered that Bennett used the disputed word immediately after the phone call. Accordingly, the prosecutor's conduct in eliciting this testimony was perfectly acceptable. Moreover, the differences between Officer Tuttle's testimony concerning the message are minor and of no significance because the tape of Bennett's message was admitted into evidence. Defense counsel reasonably decided not to object and instead made a tactical decision to thoroughly cross-examine Officer Tuttle on this matter. See Tr., Day 3, 191-97; Strickland, 466 U.S. at 689.

### 4. The Prosecution's Closing Argument

Bennett argues that his counsel's failure to object to a

number of statements made by the prosecutor during his closing argument constitutes ineffective assistance of counsel. A defense counsel's decision not to object during closing argument is generally considered to be a reasonable tactical decision. See Santiago-Martinez v. United States, 993 F.2d 1530, 1993 WL 192818, at *4 (1st Cir. 1993)(per curiam)(table, text available on Westlaw); United States v. Necoechea, 986 F.2d 1273, 1281 (9th Cir. 1993) ("Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements," the decision not to object is not ineffective assistance of counsel.) Moreover, because I conclude that none of the prosecutor's contested statements were improper and therefore, any objection by defense counsel would have been meritless, I reject Bennett's argument. See United States v. Victoria, 876 F.2d 1009, 1012-13 (1st Cir. 1989) (concluding that defense counsel's failure to raise meritless objections did not constitute ineffective assistance of counsel); see also United States v. Ortiz, 146 F.3d 25, 28 (1st Cir. 1998) (stating that defense counsel is not obliged to make a motion that would be of no benefit to his client); Singleton, 26 F.3d at 239 (stating that counsel need not raise meritless, futile claims).

The first set of challenged statements were made as the prosecution began to address Bennett's defenses. The challenged statements are indicated in bold below:

Judge Abramson will also tell you that there's a second component to reckless conduct. And that is that the defendant also acts recklessly, yet because of the voluntary intoxication he was unaware of the risks of his conduct. This is because the law is that when somebody drinks excessively and puts the lives and safety of other people in jeopardy because of their drinking, they're held responsible for that. **Voluntary intoxication is no defense to reckless conduct.** Its no excuse. **If the defendant was unaware of what he was doing to Doug because he was drunk, he still acts recklessly. That's the law . . .** [Bennett] chose to drink that alcohol that night. There was no objective reasonable reason to be fearful. Any fear that he had that night was a product of his drinking. **The law says that if you get drunk and you don't know the consequences of your behavior, and you act because of that voluntary intoxication, that's no excuse to reckless conduct.**

Tr., Day 5, 72-73; 75-76.

Bennett argues that the prosecutor exceeded the bounds of permissible argument in these statements by arguing law to the jury. I disagree.

The prosecutor's statements were a correct statement of New Hampshire law. See N.H. Rev. Stat. Ann. § 626:2, II(c) (2000) ("A person who creates such a risk but is unaware thereof solely

-18-

by reason of having voluntarily engaged in intoxication or hypnosis also acts recklessly with respect thereto."). Accordingly, there was no need for defense counsel to object to them.  See Ortiz, 146 F.3d at 28; Victoria, 876 F.2d at 1012-13. Moreover, any conceivable prejudice created by the prosecutor's statement was cured by the judge's instruction: "[i]f the lawyers have stated the law differently from the law as I explain it to you, then you must follow my instructions and disregard the statements of the lawyers."  Tr., Day 5, 84; see United States v. Ortiz, 23 F.3d 21, 26 (1st Cir. 1994) (expressing confidence that the judge's instruction offset any potential prejudice from prosecutor's closing argument).

The second set of challenged statements involved the prosecution's attempt to drive home the point that Bennett strangled Goodman for a long time, thus defeating any claim of accident.  Bennett finds fault with the prosecution's repeated references to the fact that Bennett strangled Goodman for approximately twenty minutes.  See Tr., Day 5, 58, 68, 70, 71. Bennett contends that the evidence admitted at trial does not support this statement.  I disagree.

There was substantial evidence in the record to support the

prosecutor's inference that Bennett strangled Goodman for approximately twenty minutes. Bohl testified that Bennett pressed his foot against the car horn shortly after he began choking Goodman. Tr., Day 2, 231-35. Sandra Chabot testified that the noise from the horn woke her up somewhere between 12:45 and 12:50. Tr., Day 3, 113-14. When Officer Mackey arrived at the scene at approximately 1:11 a.m., Bennett still had his forearm around Goodman's neck. Tr., Day 3, 131, 134. Since the evidence clearly supported the inference that Bennett strangled Goodman for approximately twenty minutes, the prosecutor was well within his right to argue that inference to the jury. See United States v. Hernandez, 218 F.3d 58, 68 (1st Cir. 2000), cert. denied, 121 S.Ct. 840 (2001) ("Prosecutors are free to ask the jury to make reasonable inferences from the evidence submitted at trial."); New Hampshire v. Sylvia, 136 N.H. 428, 431 (1992) ("A prosecutor may draw reasonable inferences from the facts proven . . . and has great latitude in closing argument to summarize and discuss the evidence presented to the jury." (internal quotation marks and citation omitted)). Therefore, defense counsel's decision not to object was a reasonable tactical decision. See Ortiz, 146 F.3d at 28; Victoria, 876 F.2d at 1012-13.

-20-

The third set of challenged statements are set forth in bold below:

> But things didn't work out the way [Bennett] planned.  He was very, very drunk.  **[Bohl] didn't want him to spend the night in her room, in her bed.**  She didn't want to sleep with him that night.  He was drunk, he was a jerk, she wanted to take him home.

Tr., Day 5, 60.

Bennett argues that the evidence actually showed that Bohl did want him to spend the night at her house.  In support of this argument, Bennett cites the testimony of Dan Biron who said that he thought that Bennett would spend the night at Bohl's house.  See Tr., Day 4, 165.

Bennett fails to point out, however, that Bohl testified that she told Bennett that she would bring Bennett home later that night.  Tr., Day 2, 189-90, 195-96; see also Tr., Day 4, 141.  Another witness confirmed that Bohl did not want Bennett to stay the night and that she wanted to take him home.  Tr., Day 2, 58, 60-61.  Given this evidence, the prosecutor's statements were clearly permissible.  See Sylvia, 136 N.H. at 431 ("A prosecutor . . . has great latitude in closing argument to both summarize and discuss the evidence presented to the jury." (internal quotation marks and citation omitted)).  Accordingly, defense

-21-

counsel's prudent decision not to object does not constitute ineffective assistance of counsel. See Ortiz, 146 F.3d at 28; Victoria, 876 F.2d at 1012-13.

The fourth disputed statement made by the prosecutor in his closing argument is the reference, quoted above, to Bennett as a "jerk." Tr., Day 5, 60. In the context of explaining Bohl's desire not to have Bennett remain in her house or her bed, this comment merely characterizes Bennett's antisocial behavior that evening. I can not say that this isolated comment, in this context, exceeded the bounds of acceptable argument. Nor can I say that defense counsel's decision not to object, given the evidence, was anything but sound trial strategy. See Ortiz, 146 F.3d at 28; Victoria, 876 F.2d at 1012-13.

Fifth, Bennett objects to the prosecutor's statement that Bennett was "jealous" of Goodman. Tr., Day 5, 64. This argument lacks merit because the evidence in the record supports the inference of jealousy raised by the prosecutor. Bohl testified that, on many occasions when she told Bennett about other men she was dating, he said that those men were "losers" who "weren't good enough" for Bohl. Tr., Day 2, 182. Given these prior remarks, it was reasonable for the prosecutor to suggest that

Bennett might have been jealous of men, such as Goodman, who expressed romantic interest in Bohl.  See Hernandez, 218 F.3d at 68; Sylvia, 136 N.H. at 431.  Given the reasonableness of the prosecutor's statements, the defense counsel exercised sound trial strategy in deciding not to object to these statements.  See Ortiz, 146 F.3d at 28; Victoria, 876 F.2d at 1012-13.

Finally, Bennett objects to the following characterization of Chabot's testimony as to what she heard the night of Goodman's death:

> And [Chabot] distinctly heard [Bennett] yell at Jennifer Bohl, scream at her, fuck you.  Go ahead, call the cops. You heard [Chabot's] description of that.  She said he said it in a daring way.

Tr., Day 5, 67.

Bennett's objection to these statements is misplaced.  These statements are virtually identical to the testimony of Chabot, who stated that Bennett said "F-U, go ahead, call the police" and that he sounded angry and very hostile, "[a]lmost like a dare type of thing," as if Bennett was daring Bohl to call the police. Tr., Day 3, 115.  The prosecution's correct restatement of Chabot's testimony was entirely appropriate.  See Sylvia, 136 N.H. at 431.  Accordingly, defense counsel's decision not to

-23-

object was sound trial strategy.  See Ortiz, 146 F.3d at 28; Victoria, 876 F.2d at 1012-13.  Moreover, any conceivable prejudice created by these statements was cured by the judge's instruction that the parties' closing arguments were not evidence.  Tr., Day 5, 84; see Ortiz, 23 F.3d at 26.

### 4.  Conclusion

After reviewing the record and the arguments raised by Bennett, I conclude that the actions of Bennett's trial counsel fall squarely within the bounds of reasonable professional conduct and in no way prejudiced the outcome of his trial.  See Strickland, 466 U.S. at 687.  Accordingly, I conclude that he was not denied the effective assistance of counsel.  See id.

## C.  Prosecutorial Misconduct

Bennett claims that the prosecution's comments and actions, discussed above, constituted prosecutorial misconduct because they prevented him from getting a fair trial.

To prevail on his claim of prosecutorial misconduct, Bennett must show more than mere error or impropriety by the prosecution, rather he must show that the error was so severe as to deprive him of a fair trial.  See Smith v. Phillips, 455 U.S. 209, 219

(1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"); Ferreira v. Fair, 732 F.2d 245, 249 (1st Cir. 1984). Bennett must establish that the prosecution's actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). In analyzing Bennett's claims, I must evaluate the prosecution's actions in light of the entire proceeding, not in isolation. See id. at 179-80; Donnelly, 416 U.S. at 643.

As discussed above, I conclude that none of the contested statements or actions of the prosecutors were erroneous or improper. Moreover, the trial record reveals a strong case against Bennett, including, among other evidence: (1) the eyewitness testimony of Bohl and Officer Mackey establishing that Bennett strangled Goodman; and (2) the medical examiner's expert opinion that strangulation caused Goodman's death. See, e.g., Tr., Day 2, 227-28, 232-34 (testimony of Bohl); Day 3, 134-36 (testimony of Officer Mackey); Day 4, 46-47 (testimony of Dr. Kaplan). Given the propriety of the prosecutors' actions and the

-25-

strength of the case against Bennett, I can not conclude that Bennett was deprived of a fair trial.  See Darden, 477 U.S. at 180-82 (finding, despite improper remarks by the prosecutor, that defendant was not denied a fair trial).

## IV.  CONCLUSION

For the foregoing reasons, I conclude that Bennett's arguments lack merit.  Accordingly, I dismiss Bennett's petition for a writ of habeas corpus, (Doc. No. 1).

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

June 6, 2001

cc:  Eric Bennett, pro se
     Ann M. Rice, Esq.

-26-